GIDDINGS, Respondent, v. NEFSY et al, Appellants.

(212 N. W. 507.)

(File No. 5604.　Opinion filed February 26, 1927.)

1.　**Vendor and Purchaser—Contracts—Separate Writing Executed Between Parties at Same Time, Relating to Conveyance of Separate Tracts of Land, May Be Considered as One Transaction.**

　　　Separate writings executed between same parties substantially at same time, relating to conveyance of three tracts of land, may be read together as forming parts of one transaction, though they do not, in terms, refer to each other, if, in point of fact, they are parts of single transaction.

2.　**Vendor and Purchaser—Evidence Held to Show that Conveyance of Land and Contracts to Convey Other Tracts Constituted Single Transaction.**

　　　Evidence held to show that conveyance of land and two concontracts in writing to convey other tracts made at same time were not separate, but constituted single transaction.

3.　**Vendor and Purchaser—Equity—Mistake—Evidence Held to Show Mutual Mistake of Fact as to Title of Part of Land to Be Conveyed Entitling Purchaser to Rescission of Entire Transaction.**

　　　Evidence held sufficient to show mutual mistake of fact as to state of title of tract of land in transaction in which contract was made to convey it, so that purchaser was entitled to rescission of entire transaction which involved two other tracts.

　　　Burch and Polley, JJ., dissenting.

---

Note.—See, Headnote (1), American Key-Numbered Digest, Vendor and purchaser, Key-No. 50, 39 Cyc. 1296, 1297; (2) Vendor and purchaser, Key-No. 80, 39 Cyc. 1296; (3) Vendor and purchaser, Key-No. 44, 39 Cyc. 1249, 1252.

Several instruments constituting single transaction construed together as one, see 6 R. C. L. 851; 2 R. C. L. Supp. 227; 4 R. C. L. Supp. 446; 5 R. C. L. Supp. 373; 6 R. C. L. Supp. 415.

Appeal from Circuit Court, Stanley County; Hon. John F. Hughes, Judge.

Action for specific performance by Josh. R. Giddings against William H. Nefsy and another. From a judgment for plaintiff and an order denying a new trial, defendants appeal. Reversed and remanded, with directions.

See, also, 46 S. D. 505, 194 N. W. 648.

*Henry Frawley,* of Deadwood, and *Fuller & Robinson,* of Pierre, for Appellants.

*Stephens, McNamee, O'Keeffe & Stephens,* of Pierre, for Respondent.

GATES, J. On December 10, 1919, plaintiff and wife conveyed to defendant by deed 1,040 acres of land in Stanley county, each 40-acre tract thereof being designated on the accompanying plat by the figure 1. The foregoing statement is not strictly correct because some days elapsed before the deed was actually delivered, but for the purpose of this opinion the above statement is sufficiently accurate. At the same time plaintiff contracted, in writing, to convey to defendants 320 acres, known as "Indian land," which plaintiff held under contract to purchase, each 40-acre tract of which is designated on the accompanying plat by the figure 2. At the same time plaintiff contracted, in writing, to convey to defendants 600 acres, known as "Grace Giddings land," each 40'-acre tract of which is designated on the accompanying plat by the figure 3.

The two contracts were identical in form and bound plaintiff to convey merchantable title to defendants on or before July 1, 1920, upon payment at the rate of $15.50 per acre, time being essence of contract. There was a fence around the whole 1,960-acre tract, and the Grace Giddings land was separately fenced. Defendants were Wyoming ranchers, and, owing to the scarcity of feed, they desired to purchase this ranch upon which to place some of their cattle. The whole 1,960-acre tract was sold to them at $15.50 per acre. Defendants paid $6,120 in cash and executed a note for $10,000, secured by mortgage on the 1,040 acres. Thereafter defendants learned that part of the Grace Giddings land was "government land," and that Grace Giddings, sister of plaintiff, refused to be bound by plaintiff's contract with defendants as to

her land, and in March, 1920, they gave notice of rescission of the entire transaction, tendered a deed of reconveyance of the 1,040 acres, and demanded a return of $6,120 paid. Plaintiff has never procured nor attempted to procure title to the Grace Giddings

land, but did procure title to the Indian land, and in April, 1920, tendered the deed therefor to defendants. In August, 1920, this action was begun to compel specific performance by defendants of the contract relating to the Indian lands. The trial court found

for plaintiff. An appeal was taken to this court, and the judgment was vacated. See 46 S. D. 505, 194 N. W. 648. Thereafter the trial court on December 3, 1923, made new findings of fact and conclusions of law in favor of plaintiff and on December 21, 1923, rendered judgment for plaintiff. Therefrom and from an order denying new trial defendants appeal.

[1] The predominant question upon this appeal is whether the three instruments in question; viz., the deed to the 1,040 acres, the contract as to the "Indian land," and the contract as to the "Grace Giddings land," constituted a single transaction, or whether they were separate and independent transactions. If the transaction was single, then the mere fact that it was carried into effect by separate instruments was not significant. Bailey v. Hannibal & St. J. R. Co., 17 Wall. 96, 21 L. Ed. 611; Torrey v. Shea, 29 Cal. App. 313, 155 P. 820.

[2] Contrary to the undisputed evidence, the trial court found the three transactions to be separate and independent of each other. In a portion of his testimony respondent did attempt to convey the impression that the transactions were separate, but upon cross-examination he testified as follows:

"Q. As a matter of fact, you considered that the Grace Giddings land was part of the ranch that you had for sale, did you not, at that time? A. Well, to sell on agreement or the way I was going to sell; yes, sir. * * *

"Q. And the price of $15.50 an acre was talked over at that time, was it not? A. That is the way we put it; all at a certain price, and that is the way that Mr. Lane put it to them out at Wendte.

"Q. And that is the way it was put to the Nefsys at the Stock Growers' Bank at the time the papers were drawn up, wasn't it? Nineteen hundred sixty acres at $15.50 per acre, is that so or not? A. Well, I guess it was. * * *

"Q. It is true, or is it not, that you told Mr. Sumner and Mr. Nefsy at the bank on December 19th that you would not sell this 1,040 acres unless you sold the other two tracts? A. At that price; yes.

"Q. You said that you wouldn't take $15.50 an acre for this 1,040 acres of land unless they agreed to pay $15.50 for the other 920 acres. You made that statement, didn't you? A. Yes, sir.

"Q. And when you finally got to your papers, signing and drawing them, and the negotiations leading up to the signing of the papers, you believed that you were selling 1,960 acres of land, at $15.50 an acre, didn't you. A. Well, on the contract provided that the title was all right under the contracts. * * *

"Q. And part of the reason for you cutting down the price on the 1,040 acres of land, rather than making a flat price of $15 clear through, was that it would be a profit to you on the 600 acres, of the Grace Giddings land, is that so?. A. In my way of figuring, taking $5 off my land and making it up on Grace's land. I figured mine at the time at $20 an acre and this other land at $10.

"Q. And that is why you consented to have the papers made out to cover the 1,960 acres at $15.50 an acre, isn't it? A. Yes, sir."

Also, Mr. Sumner, the principal witness for respondent, who was present at the negotiations at the time the transaction was completed, testified:

"Nefsy said he wanted the land he bought deeded and that he would buy the land from Giddings that he could deed, and about the other land he said that he did not care about taking the other land, but Giddings did not want to sell the main ranch without selling the Indian land, especially, and the only way Nefsy would consider buying that was under a short time contract; that Giddings said he wanted the Grace Giddings land to go in under contract, and Nefsys agreed to give a contract to July 1st, but no longer."

Upon the question as to whether the transaction was single or tripartite, it is immaterial whether appellants or respondent or both insisted upon the inclusion of the "Indian land" and the "Grace Giddings land" in the deal. Appellants testified that they would not have bought the 1,040 acres alone. Sumner testified that the lands covered by the contracts were included at respondent's insistence, and respondent grudgingly admitted such to be the fact. It is therefore clear, as above stated, that the courts' finding that the transactions were separate and independent is contrary to the undisputed evidence.

[3] At the trial the following facts were stipulated with reference to the "Grace Giddings land": Of the 600 acres she had

a patent to 160 acres in 1914; she had made an additional homestead entry upon 160 acres in 1916, but final proof had not been made; as to the remaining 280 acres she had filed application in May, 1919, under the Stock Raising Act, but action on her application had been suspended, and on April 20, 1920, these lands were designated as stock raising lands, and her application was allowed on July 28, 1920, and patent was issued to her April 30, 1921.

The trial court found:

"That said Grace Giddings informed the said defendants of the character of said holdings and the filings under which they were taken, or in the future, intended to be held by her, and the said defendants were fully and truthfully informed by the plaintiff and said Grace Giddings of the title to said lands * * * and further requested said plaintiff to enter into a third separate agreement for the sale by plaintiff and purchase by defendants of the land filed upon by said Grace Giddings, and that said plaintiff, at the request of defendants, made said third, separate agreement, the same being contingent upon his afterward acquiring title to said tract and without representation, or assurance, upon the part of the plaintiff, that he could or would obtain title to said tract, the said defendants then relying upon their talk with said Grace Giddings and expecting that said Grace Giddings might, if she obtained title to said lands, thereafter sell the same through the said plaintiff to the said defendants."

Those findings are without support in the evidence.

Appellant William Nefsy testified:

"That Giddings, in reference to the 600 acres of land, said that it was Grace's homestead, but that she could prove up any time, and that he had made arrangements with her to sell it, and that he had paid her money on it right along and had it pretty nearly all paid for; that Grace Giddings would get a full patent to the land, and that Giddings had a right to sell it."

Respondent testified:

"Q. Isn't it a fact that you told them that you could deliver that land to them, and that you had a right to sell it, and that you had made proper arrangements with Grace Giddings so that you could sell it, isn't that so? A. They had a talk with Grace herself and had an understanding with her.

"Q. That doesn't answer my question. A. Yes; on agreements is all.

"Q. And was there a talk or not a talk, as to whether or not you had made arrangements with her so that you could sell her land? A. Yes; there was.

"Q. You had made those arrangements with her? A. Well, with her and them. She told them and me the day that she had a talk with them.

"Q. And when you told them that you had made arrangements with her so that you could sell her land, you also told them that she owned the land, didn't you? A. Yes, sir.

"Q. And you knew at that time that she had not even filed on that land, didn't you? A. No, sir; I didn't.

"Q. When you were dealing with the Nefsys out there, did you actually know whether or not she owned that 600 acres? A. Well, I don't remember that there was anything said about it. She said she had talked to them.

."Q. Did you know or not whether she had filed upon this land at that time? A. Not only by what she said.

"Q. So when you talked with the Nefsys and referred to the 600 acres of Grace Giddings land you were relying upon what Grace Giddings told you, were you? A. Yes, sir.

"Q. And she had told you that she owned this 600 acres, is that true? A. Well, I knew she hadn't proved up on some of it.

"That witness did not know Grace Giddings had not filed on some of the land; that Grace had told witness that she had filed on all of it.

"Q. And then you told the Nefsys that she had filed on all of it, didn't you? A. I couldn't say as to that. I told them that it wasn't proved up on, and she told them herself, and we all did.

"Q. And at that time you didn't know that she actually had not filed on some of it at all? A. No, sir; I did not.

"Q. And you believed that she had filed on all of it, all of the 600 acres, at the time you talked to the Nefsys. A. Yes, sir.

"That defendants wanted to buy Grace Giddings' land and she said that defendants could contract her land with the other land when it was patented; witness signed a contract to deliver the 600 acres and sell to the defendants; that witness, before the contract was signed, did not tell defendants that Grace Giddings had

not filed on some of that land, and that Grace did not give defendants this information.

"Q. And when you were in the bank, you said she could prove up on the land at any time, both you and Mr. Sumner made that statement? A. I said that she had filed on the land.

"Q. And all of these tracts of land which were pointed out on this place (plat) were discussed as to their respective titles, were they? Yes, sir.

"Q. Now state what was said with reference to the 600 acres of Grace Giddings' land. A. Some of it was proved up, and some of it was ready to be proved up.

"Q. Who said that? A. I don't remember whether I said that myself or Mr. Sumner; one of us said that.

"Q. That some of it was proved up and had not been filed on, is that correct? A. Yes; that witness did not know this statement was not true; that he was in the land office at the time she filed on it and saw her pay her money for the filing on it; that they accepted her money for filing on it, but that he knew that she had not proved up on this land.

"Q. But you told them she could prove up on it? A. Yes.

"Q. And that she had proved up on some of it? A. Yes."

Therefore whether the evidence is sufficient to sustain a finding of willful misrepresentation as to the facts concerning the "Grace Giddings land" is immaterial. It is sufficient to sustain a finding of mutual mistake of fact and sufficient to justify the rescission of the transaction by appellants. Upon the clear preponderance of the evidence the trial court should have found for appellants and adjudged them a cancellation of the whole transaction and a recovery of the money paid.

The trial court made the following further finding:

"That at the time of tendering said title by plaintiff to defendants conditions relating to the stock and ranch of said defendants had changed—their stock had been wintered; * * * and having wintered their stock thereon, and the land in the vicinity of said ranch appeared to be in less demand than in the winter of 1919 and the said defendants, by reason of said facts and without cause of any kind, willfully failed and refused to accept the title tendered by said plaintiff, or the conveyance thereof."

This finding is wholly gratuitous and without support in the evidence.

The judgment and order appealed from are reversed, and the cause is remanded for further proceedings not inconsistent with this opinion, with directions to the trial court to call in another circuit judge to make further disposition of the case.

BURCH, J. I regret that I am unable to agree with the majority of the court. Whether the deed and the contract to the "Indian land" and the contract to the "Grace Giddings land" are to be considered as three independent contracts simultaneously entered into, or three independent covenants of a single transaction, the result should be the same.

The defendants seem to concede that if the two contracts for deed are separate contracts, they are not entitled to prevail, but contend that if they are parts of a single transaction, the breach of one entitles them to rescind the whole. The majority opinion seems to assume the correctness of this position. I am unable to see the reason for the distinction. If the three tracts were separately dealt with and three separate transactions were had, evidenced by three separate instruments, under proper pleadings it might be shown that one was an inducement for the others justifying a rescission of the others upon breach of one. On the other hand, if they were all parts of a single transaction, they are not different in character. Whether they are independent covenants of a single transaction, or independent contracts, a breach of one is not ground for a rescission of the others. If they are dependent covenants of a single transaction, or dependent separate contracts, then the breach of one may be ground for a rescission of the others. The distinction is the dependence of one upon the others, and not whether they compose one or several transactions. The "Grace Giddings land" was not owned by plaintiff, and all parties knew this. All parties knew plaintiff might not be able to convey. Provision was made for such contingency, and it was not provided that a rescission could be had. As a single transaction the contract affecting that land is complete and cannot be varied by parol evidence. The "Indian land" was owned by plaintiff, and he could contract as to that, but could not deliver immediate title; therefore the contract as to that was separate, con-

6—Vol. 51, S. D.

forming to the condition existing in reference to it. The other lands could all be forthwith conveyed. This was done. Each was governed by the conditions existing affecting each, and as to each tract the contract was complete. Therefore, if either or all were dependent upon the others as a single contract, there must be a provision to that effect. I think they are plainly independent in form, and there is no evidence of their dependence in fact.

Considering the instruments as all evidencing a single transaction, they must be construed together, but there is nothing in the language used to indicate their dependence. The plain and unambiguous language treats each separately and independently, and no attempt is made by allusion to the other tracts to connect one with the others. And considering the purchase of all as a single transaction, the fact that the purchase of each tract is evidenced by a separate instrument reinforces the language used, so the intent of the parties cannot be mistaken.

Conceding that the deed and the two contracts were all part of a single transaction and that the fact that the single transaction is evidenced by three separate instruments is not significant (except as a circumstance in construing the contract), the contracting parties did, in fact, by express provisions deal separately with each tract. As to the "Grace Giddings land," a failure of Giddings to furnish title to the independently described tract was, by its express terms, not to constitute a breach of such covenant, but was to terminate the covenant. This is shown by these provisions of the contract:

"And the said parties of the second part hereby covenant and agree to pay to the said party of the first part the sum of $9,300 in the manner following:

"Said payment to be made when the party of the first part furnishes to the party of the second part a merchantable title to the above land.

"Said title to be furnished by the party of the first part on or before July 1, 1920, at which date this contract for deed expires."

Surely these provisions as to the "Grace Giddings land" must be treated as independent covenants. They are complete and allude to no other provisions of the transaction. The land is specifically described, an independent and entire consideration is stated, the

character of the title to be furnished, the time it is to be furnished, and the consequences, if the title is not furnished, are all mentioned.

Though all the instruments be considered together and be given the same effect as if all were written and executed in one instrument, the contract evidenced thereby should be interpreted to carry out the agreement of the parties and to effect its object and purpose. The result reached by the majority opinion works an injustice. If an injustice is to be done, it must be because the contract is unjust and harsh. Before it is so interpreted, it should be clear that the parties entered into it and intended its harsh provisions. If it is capable of a fair and conscionable interpretation equally consistent with its language and purpose, it should be so construed. Unless the language is plain and unambiguous to the contrary, it should be presumed that the parties intended to deal fairly with each other.

The defendants were Montana ranchmen with a large number of cattle to care for. On account of an unsual drought in Montana, they had to seek pasture and hay farther east. They were experienced business men, familiar with land deals, at least one of them having been a land broker. There is no claim that there was any inequality in the business acumen of the contracting parties.

In the case at bar, the deeded land was worth more per acre than the "Grace Giddings land," and, according to plaintiff, worth more alone than with the other land. Lane, the broker who was instrumental in effecting the sale, testified for defendants, and he says the defendants discussed the possibility of selling the land and wanted to sell as soon as defendants' temporary needs were satisfied. There is no evidence that a better sale cannot be made with the "Grace Giddings land" out, or that Giddings' failure to deliver title to that land damaged defendants. On the contrary, the evidence and the facts and circumstances surrounding the transaction indicate it was to the advantage of defendants to have Giddings fail. This was probably the reason for separating the "Grace Giddings land" from the balance and making time so essential, so that defendants might not have to accept it. But whether it was, or not, they cannot insist on the time of performance to defeat that provision and at the same time use such default as an excuse for rescission of the balance of the contract. By the terms of the

contract time is made essential, but not otherwise. There is no inherent reason why it is so.

This contract ought not to be set aside, where conditions have changed by a depreciation in the value of the land so that the seller cannot be made whole by a return thereof, and after the purchasers have gained all the advantages that it afforded to them in the first instance. If they have been damaged by a breach of one of its covenants, they should seek relief in damages, and not in rescission. It is not just for them to obtain the use of a South Dakota ranch, purchased for temporary use, and escape the loss by depreciation in the value of the land while they held it under fee title. Nothing short of actual fraud, willful misconduct on the part of the seller, or an unambiguous contract to that effect ought to effect that result. It is difficult to see how the parties could have separated the "Grace Giddings land" from the other two tracts by stronger language than was used. If what was done did not separate such tract from the others, it would tax the ingenuity of any draftsman to draw a contract which would separate the tract making it independent of the balance of the transaction. Yet, I think, it will not be denied that the parties had a right to so contract if they desired.

I think defendants have no right to rescind as to the deeded lands. I think plaintiffs should also have a decree specifically enforcing the contract for the "Indian land" unless there is some equitable reason why such relief should be denied. It may be the location of the tract or some other consideration would warrant this court in refusing equitable relief to plaintiff, but not on the defense interposed by defendants.

POLLEY, J., concurs in the dissent.